Filed 6/11/26 In re E.P. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re E.P. et al, Persons Coming Under the Juvenile Court Law. | B343671 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 24CCJP00706AB |
| Plaintiff and Respondent, | |
| v. | |
| E.H., | |
| Defendant and Appellant. | |

APPEAL from orders and judgment of the Superior Court of Los Angeles County, Juan M. Valles, Commissioner. Affirmed.

Lillian Hamrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

_____

A mother appeals the juvenile court's orders assuming jurisdiction over her two daughters and awarding their father sole legal and physical custody.  We affirm. Code citations are to the Welfare and Institutions Code.

I

The mother and father met on eHarmony in 2010.  They were in a relationship within six months and married in 2012.  Their daughters are E.P., born June 2014, and B.P., born August 2016.  By April 2016, the parents had separated.

Sometime in July 2017, the mother brought E.P. to the emergency room.  She claimed paternal aunt Leonor H. had molested E.P.  The mother had shown E.P. a photo album of relatives, and E.P. pointed at a photo of Leonor H.  E.P. also reported that Leonor H. touched her "down there."

E.P., however, did not seem to be in distress.  The doctor who examined her found no evidence of sexual abuse or trauma.  The Los Angeles County Department of Children and Family Services later determined the sexual abuse allegation to be unfounded.

In December 2017, the parents' divorce became final in Orange County Superior Court.  According to the judgment, the parents would share joint legal custody of the children, the mother would have sole physical custody, and the father would have visitation two or three times a week.

There were no issues with the family's arrangement until March 2020, when the mother stopped allowing the father to see

2

the children because she was worried the children would contract COVID-19.

A few months later, in August 2020, the mother took the children and moved to Florida for a job opportunity. Maternal relatives unsuccessfully tried to stop the mother from moving. The father was unable to stop her because the court order was silent on the mother's ability to make a unilateral out-of-state move. As a result, the father made plans to move to Florida to be able to see his children.

The father also petitioned the Orange County family court for a change in custody because of his concerns with the mother's mental health. He claimed that after she moved, the mother was not letting him spend time alone with the children when he went to Florida for visits. His petition included a letter from the mother's brother Emmanuel H., which described the mother's paranoid behavior, as she kept saying people were "out to get" her and that a dollhouse was haunted. According to the letter, the mother also accused the maternal grandmother of trying to poison her and giving away her social security number, while also threatening to kill the grandmother. When her family members told her to get help for her mental health, the mother would become defensive and angry.

Following a child custody investigation, in March 2021, an Orange County family court extended the father's visitation rights, but maintained the mother's sole physical custody of the children. The court also ordered the mother to "participate in individual counseling with a licensed mental health professional, weekly, for a minimum of six months and continue at the discretion of the therapist." The Florida Circuit Court later adopted this order.

3

In August 2021, near a Verizon store in Clermont, Florida, the mother, accompanied by E.P. and B.P., started taking photos of a parked car's license plate. The owner of that car, Morgan H., approached the mother to ask why she was taking pictures of her car. The mother started to yell at Morgan H. and her husband Richard H., accusing them of being white supremacists and stealing her social security number. Then the mother punched Morgan H. in the face several times, knocking off her sunglasses before Richard H. intervened and broke them apart.

A police officer soon arrived at the scene and interviewed the mother. The mother admitted she punched Morgan H. The officer's report stated their belief that the mother was in "an altered state of mind" because she "kept mentioning that people are out to get her."

Although law enforcement charged the mother with misdemeanor battery of Morgan H., she was found incompetent to stand trial.

## II

In April 2022, the father petitioned the Florida Circuit Court for full custody of the children, as he had moved to Florida. If the mother could complete a mental health evaluation with no identified issues, the father would agree to 50/50 custody.

In March 2023, a Florida judge granted in part the father's request for more time with the children and ordered the mother to participate in individual counseling with a licensed mental health professional on a weekly basis.

However, just a few months after the Florida judge issued this order, the mother moved with the children back to West Covina. She said she moved back to California to get health care and to live rent-free on her parents' property. After moving back

4

to California, the mother was no longer working, but was able to receive some welfare benefits.

The father petitioned the Florida Circuit Court for help because the mother's relocation to California interfered with his visitation rights. During these proceedings, the mother alleged that in July 2023, strangers had molested both E.P. and B.P. at the public library and the RV park where they had been living. However, when law enforcement interviewed the children about the touching, they reported the children had been "coached" or told what to say, "as each story did not make logical sense." Law enforcement also reported the mother "appeared to have some form of mental, delusional beliefs and ways of thinking."

In a September 2023 order, the Florida court found "[t]he available evidence strongly suggests that the Mother has ongoing mental health issues" and directed the mother to "IMMEDIATELY … submit to a neuropsychological (or equivalent exam) to determine the cause of her delusional thoughts." The court also ordered the mother to return to Florida by the end of the month. If she failed to do so, the court authorized the father to retrieve the children from California with the assistance of law enforcement.

The mother did not heed this order. Instead, in September 2023, she filed a request in Orange County family court for the father's visits to take place in California. She submitted a declaration stating her need for "an emergency order" permitting her and the children to stay in California and her belief that the Florida court was "violating [her] rights as a parent."

In January 2024, the mother brought E.P. to a clinic. During the intake, the mother reported hearing voices outside of her home. She said the voices sounded like people speaking

through a microphone harassing her and telling her to kill herself.

Just after the intake, the Department received a referral to investigate the mother.  Department social worker Funmi Tofowomo went to the mother's home and interviewed her, the children, and the mother's relatives.

The mother repeated her claims of hearing voices outside of the home harassing her.

The children echoed the mother's claims, saying they too heard voices saying "bad words" on a "loudspeaker."  Tofowomo believed the mother had coached the children to say they heard threatening voices.

The maternal grandmother told Tofowomo the mother had serious mental health issues and was in denial.

Tofowomo called the father, who was still living in Florida. The father said the court had denied his request for custody of the children, despite knowing of the mother's mental health problems, much to his frustration.

In February 2024, the mother filed a declaration in Orange County court alleging Tofowomo was "not a legitimate social worker" and stating she felt "mentally able and calm."

As part of the Orange County family court proceedings, the father came back to California to attend a hearing.  He said he intended to stay in California pending the outcome of the proceedings.

### III

In March 2024, a Los Angeles juvenile court granted the Department's request for an order authorizing removal of the children from the mother.  The children were removed from the mother and released to the father that same day.

When the Department tried to serve the mother with the removal order, the mother accused Tofowomo of being a "deranged lunatic that needs help" and of "working here illegally."

A few days later, the Department filed a section 300 petition, alleging there was a substantial risk the children would suffer serious physical harm on account of the mother's mental and emotional problems.

The following week, after the Florida Circuit Court relinquished jurisdiction, an Orange County family court awarded temporary sole legal and sole physical custody of the children to the father, and allowed for the mother to have monitored visits. The court also ordered the mother to attend counseling or therapy "for six months regarding parental incapacity and any other mental health related issues." The Orange County court then transferred the case to the Los Angeles juvenile court.

At the initial hearing in Los Angeles, the juvenile court found the Department made a prima facie case under section 300, ordered the children detained from the mother, and that the children remain with the father.

In July 2024, the Department reported the mother was still refusing to get help for her mental health and was continuing to "display odd behaviors, such as talking to herself and making random hand gestures."

The following month, the mother assaulted Department social worker Clarissa Sanchez during a monitored visit at a park in front of the children.

It began after the mother asked Sanchez about scheduling a meeting with the father, and Sanchez told the mother they

could discuss it after the visit. This somehow angered the mother, and she told Sanchez "this is why I'm going to get you fired … you are the worst social worker, a 24-year-old girl. You are unprofessional."

Sanchez warned the mother to refrain from making further comments or else she would end the meeting. The mother responded that Sanchez could not end the visit before it was scheduled to end, and complained that the visits should not be monitored.

Because of the mother's behavior, Sanchez decided to end the visit and told the girls to walk to Sanchez's car. The mother protested, saying "I'm your mother, not her; you don't have to listen to her." The mother lunged towards Sanchez, placing herself within inches of Sanchez's face.

Sanchez then told the mother she was ending the visit and took the children by their hands and started leading them to her car.

The mother blocked Sanchez, saying "you are not cancelling my visit. The children don't want to go."

E.P. said "I actually do want to go." When the mother asked why, E.P. responded "because I don't like the way you talk to people sometimes," and began to cry.

As Sanchez tried to escort the children away, the mother pushed Sanchez to the ground and pulled her hair, yelling "those are my fucking kids!" Both children started screaming and crying.

The mother tackled Sanchez and started hitting Sanchez's head and neck with a closed fist. Sanchez managed to get away and called 911.

Sanchez approached E.P., who was crying and shaking, and said she needed to be alone.

The mother looked at Sanchez and another social worker who had come over to help, and said "I shouldn't have my kids taken away. I'm not a drug addict."

Soon thereafter, the supervising social worker, the father, and two Sheriff's Department deputies arrived. The children left with their father and the deputies cited the mother for battery.

Two days later, the mother emailed the Department, writing that Sanchez had pushed her away from the children, hit her, and kicked her. The mother accused Sanchez of making up lies about her, and attached photographs of her injured arms and legs.

The Department filed an amended section 300 petition, alleging the children were at substantial risk of serious physical harm and emotional damage based on the mother's mental and emotional problems and her assault of Sanchez.

The Department also filed a report recommending the mother's monitored visits take place at a law enforcement agency to protect the children. It included statements from several people who had witnessed the mother attacking Sanchez at the park.

In October 2024, the Department submitted its jurisdiction/disposition report. Therein, it recommended the court sustain the amended petition, terminate jurisdiction and issue a new order granting joint legal custody to the mother and father but full physical custody to the father, with monitored visits for the mother.

The next month, however, the Department changed its recommendation to granting sole legal and physical custody to

the father, with monitored visits for the mother. Maintaining legal custody for the mother would interfere with medical care for the children in situations requiring consent from both parents. Its November 2024 report detailed how the mother had delayed dental treatment for the children by refusing to grant consent for the dentist to commence treatment. According to the dentist, the mother ignored the dentist's repeated attempts to contact her. The mother acknowledged receiving calls from the dentist, but believed the dentist had committed insurance fraud without explanation or proof.

At the November 2024 adjudication and disposition hearing, Department investigator Annette Martinez and the mother testified.

Martinez summarized the Department's position as follows: "the Department is concerned that because [the mother] is not getting the mental health treatment that we think she needs, the children will continue to be exposed to [her] behaviors … the children have been crying during [the mother's] visits because of her physical altercation, so we're worried that the children will continue to be exposed to that."

The mother admitted she had previously been diagnosed with PTSD and general anxiety, but denied needing therapy. If she had difficulties with her mental health, the mother believed her background as a mental health therapist would equip her to know when to seek therapy for herself.

Regarding the August 2024 visit at the park, the mother said she acted in self-defense. According to the mother, Sanchez interrupted her while they were talking and said she was not allowed to talk to her children about school supplies. The mother

10

said Sanchez initiated the conflict by pushing her. She denied threatening Sanchez.

At the end of the hearing, the mother, through counsel, asked the court to dismiss the petition in its entirety.

Citing the "cumulative effects" of the mother's "disordered behavior" and the fact that the mother had attacked people on two separate occasions in the presence of the children, the court sustained the amended petition in its entirety.

As for disposition, the court found the children were safely in the custody of the father, it was in their best interest to remain with him, and terminated jurisdiction. The court awarded the father sole legal and physical custody, finding any maintenance of jurisdiction or extending enhancement services to the mother "would likely be a futile act" in light of the mother's denial of her role in creating problems for the family and refusal to get help. The court further ordered continued monitored visitation for the mother.

In January 2025, the court issued its final judgment reflecting these custody orders.

## IV

The mother makes two arguments on appeal. First, she contends the juvenile court erred in asserting jurisdiction over this case because her mental health issues did not establish a "current, non-speculative risk" of serious emotional or physical harm to the children at the time of adjudication, as required by section 300. To this end, she reviews each of the three counts the court sustained and attempts to explain how the Department fell short in proving each one. Second, the mother argues the juvenile court abused its discretion by awarding father sole legal custody instead of joint legal custody.

11

Both arguments fail.

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re R.T.* (2017) 3 Cal.5th 622, 633.) We examine the record in the light most favorable to the judgment, draw all reasonable inferences in its support, and defer to the juvenile court's fact and credibility findings. (*Ibid*.) The mother has the burden on appeal of showing there is insufficient evidence for the juvenile court's order. (*In re M.D.* (2023) 93 Cal.App.5th 836, 851 (*M.D.*).)

When a dependency petition alleges multiple grounds for jurisdiction, we can affirm the juvenile court's jurisdiction finding if substantial evidence supports any one of the statutory bases for jurisdiction enumerated in the petition. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

For simplicity, we focus on subdivision (a) of section 300, under which jurisdiction is warranted where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

Substantial evidence easily supports jurisdiction under this subdivision. The mother's mental illness alone would not warrant jurisdiction. (See *In re N.R.* (2023) 15 Cal.5th 520, 558 ["courts have routinely rejected the equation of mental illness with a significant risk of serious harm … "].) But here, the record is replete with evidence of the mother's mental illness causing behavior that repeatedly put the children at a substantial risk of serious physical harm. Examples include the mother's hallucinations of "microphone" voices telling her to kill herself, unprovoked attacks on Morgan H. and Sanchez in the presence of the children, paranoid and delusional beliefs about people being

12

"out to get" her, repeated unfounded allegations that people had molested the children, withholding consent for her children's medical treatment without justification, and coaching her children to report and believe that they also heard the voices their mother heard.

As the Department rightly observes, it is equally significant that the mother continually denied having mental health problems, rejected treatment, and ignored multiple court orders that she seek professional help. In her opening brief, the mother maintains that much of the problematic behavior was in the past and that her attack on Sanchez in August 2024 was an "isolated act of violence, without evidence of a continuing danger or pattern likely to recur." But because the mother continuously denied her mental health was suffering and refused help, it was reasonable for the juvenile court to consider her past behavior and find it necessary to assert jurisdiction to safeguard the children. (See *M.D.*, *supra*, 93 Cal.App.5th at pp. 848–849 ["the juvenile court may consider past events when determining whether a child presently needs its protection"].)

As for the final custody order, the mother cannot meet the insurmountable burden of proving the juvenile court "exceeded the bounds of reason" in awarding full legal custody to the father. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.) The mother points out that the Department initially recommended ordering joint legal custody and did not change this recommendation until its November 2024 report just before the adjudication hearing. She tries to minimize her interference with the children's medical care as a "misunderstanding of a single administrative issue," and claims the juvenile court based its custody decision on this one issue.

13

The mother's characterization of the juvenile court's custody decision is incorrect. The juvenile court explained its decision by reiterating the mother's persistent denial of mental illness and refusal to seek treatment. It found the mother's "thinking is so disordered and dangerous that sole legal [custody to the father] is in the best interest of the children" because it could not trust her to "make rational, logical decisions for the children … given her unresolved mental health issues." This determination reflects the juvenile court's careful consideration of the evidence in light of the children's best interest. It was well within its discretion in making this decision.

**DISPOSITION**

We affirm the orders and judgment.

WILEY, ACTING P. J.

We concur:

VIRAMONTES, J.

SCHERB, J.

14